## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **Envision Healthcare Corporation**, *et al.*,[1] | § | **Case No. 23-90342 (CML)** |
| | § | |
| Debtors. | § | **(Jointly Administered)** |
| | § | |

| | | |
|---|---|---|
| **VIBRANT CAPITAL PARTNERS, INC., VIBRANT CREDIT PARTNERS, LLC, SARATOGA INVESTMENT CORP. CLO 2013-1 LTD., AND CRESCENT CAPITAL GROUP, LP,** | § § § § § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **ENVISION HEALTHCARE CORPORATION; ARROWMARK COLORADO HOLDINGS LLC; AS BIRCH GROVE, LP; BARINGS LLC; BENEFIT STREET PARTNERS, LLC; BLACK DIAMOND CREDIT STRATEGIES MASTER FUND, LLC; BLACKROCK FINANCIAL MANAGEMENT, INC.; BLACKSTONE ALTERNATIVE CREDIT ADVISORS LP; BOFA SECURITIES, INC.; BRIGADE CAPITAL MANAGEMENT LP; BROADRIVER ASSET MANAGEMENT, L.P.; CANYON PARTNERS, LLC; CARLYLE CLO MANAGEMENT LLC; CIFC ASSET MANAGEMENT LLC; COLUMBIA CENT CLO ADVISERS, LLC; EATON VANCE MANAGEMENT; FIRST EAGLE ALTERNATIVE CREDIT, LLC; FIRST TRUST CAPITAL** | § § § § § § § § § § § § § § § § § § § § § | **Adv. Proc. No.: _____** |

---

[1]  A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/Envision. The Debtors' service address is 1A Burton Hills Boulevard, Nashville, Tennessee 37215.

| | |
|---|---|
| **SOLUTIONS, L.P.; FIRST TRUST** | § |
| **ADVISORS, L.P., HPS INVESTMENT** | § |
| **PARTNERS, LLC; HSBC AMERICAS** | § |
| **CORPORATION (DELAWARE);** | § |
| **INTERMEDIATE CAPITAL GROUP,** | § |
| **INC.; INVESCO SENIOR LOAN FUND;** | § |
| **IRRADIANT PARTNERS, LP; KING** | § |
| **STREET CAPITAL MANAGEMENT,** | § |
| **L.P.; MARATHON ASSET** | § |
| **MANAGEMENT, L.P.; MARINER** | § |
| **INVESTMENT GROUP LLC;** | § |
| **MIDOCEAN PARTNERS, L.P.; MJX** | § |
| **ASSET MANAGEMENT LLC; NAPIER** | § |
| **PARK GLOBAL CAPITAL (US) LLC;** | § |
| **NEUBERGER BERMAN INVESTMENT** | § |
| **ADVISERS LLC; NYL INVESTORS LLC;** | § |
| **OAK HILL ADVISORS, L.P.; OCTAGON** | § |
| **CREDIT INVESTORS, LLC; PALMER** | § |
| **SQUARE CAPITAL MANAGEMENT,** | § |
| **LLC; PGIM, INC.; PPM LOAN** | § |
| **MANAGEMENT COMPANY, LLC;** | § |
| **REDDING RIDGE ASSET** | § |
| **MANAGEMENT LLC; REDWOOD** | § |
| **CAPITAL MANAGEMENT, LLC;** | § |
| **SCULPTOR LOAN MANAGEMENT LP;** | § |
| **SOUND POINT CAPITAL** | § |
| **MANAGEMENT, LP; STRATEGIC** | § |
| **VALUE PARTNERS, LLC; VICTORY** | § |
| **CAPITAL MGMT., INC.; VOYA** | § |
| **ALTERNATIVE ASSET MANAGEMENT;** | § |
| **VOYA INVESTMENT MANAGEMENT** | § |
| **CO. LLC; WELLFLEET CREDIT** | § |
| **PARTNERS LLC,** | § |
| | § |
| **Defendants.** | § |

## **COMPLAINT**

Plaintiffs Vibrant Capital Partners, Inc.; Vibrant Credit Partners, LLC; Saratoga Investment Corp. CLO 2013-1 Ltd.; and Crescent Capital Group, LP (together, "**Plaintiffs**"), by and through their undersigned counsel, brings this action against Defendants Envision Healthcare Corporation ("**Envision**" and, together with its affiliated debtors and debtors-in-possession,

"**Debtors**"); Arrowmark Colorado Holdings LLC; AS Birch Grove, LP; Barings LLC; Benefit Street Partners, LLC; Black Diamond Credit Strategies Master Fund, LLC; BlackRock Financial Management, Inc.; Blackstone Alternative Credit Advisors LP; BofA Securities, Inc.; Brigade Capital Management LP; BroadRiver Asset Management, L.P.; Canyon Partners, LLC; Carlyle CLO Management LLC; CIFC Asset Management LLC; Columbia Cent CLO Advisers, LLC; Eaton Vance Management; First Eagle Alternative Credit, LLC; First Trust Capital Solutions, L.P.; First Trust Advisors, L.P. HPS Investment Partners, LLC; HSBC Americas Corporation (Delaware); Intermediate Capital Group, Inc.; Invesco Senior Loan Fund; Irradiant Partners, LP; King Street Capital Management, L.P.; Marathon Asset Management, L.P.; Mariner Investment Group LLC; MidOcean Partners, L.P.; MJX Asset Management LLC; Napier Park Global Capital (US) LLC; Neuberger Berman Investment Advisers LLC; NYL Investors LLC; Oak Hill Advisors, L.P.; Octagon Credit Investors, LLC; Palmer Square Capital Management, LLC; PGIM, Inc.; PPM Loan Management Company, LLC; Redding Ridge Asset Management LLC; Redwood Capital Management, LLC; Sculptor Loan Management LP; Sound Point Capital Management, LP; Strategic Value Partners, LLC; Victory Capital Mgmt., Inc.; Voya Alternative Asset Management; Voya Investment Management Co. LLC; and Wellfleet Credit Partners LLC (collectively, "**Lender Defendants**" and, together with Envision, "**Defendants**"), and allege upon personal knowledge as to their own acts, and upon information and belief as to all other matters, as follows:

## <u>INTRODUCTION</u>

1.  Plaintiffs collectively hold approximately $47.8 million of Envision's so-called "fourth-out term loans" ("**Fourth Out Loans**"; holders of same, "**Fourth Out Lenders**"). Until July 2022, Plaintiffs were *pari passu* with all other lenders under Envision's approximately $5.8 billion aggregate principal amount term loan facility ("**Term Loans**"; holders of same,  "**Term**

Loan Lenders"). [2] But, following a July 22, 2022 purported amendment to the Original Credit Agreement executed by Defendants ("**Amended Credit Agreement**"), Plaintiffs were transformed from *pari passu* lenders to last-in-line behind three other tranches of Term Loans, including those held by Lender Defendants and/or funds managed by the Lender Defendants.

2.      This action challenges that improper and unlawful amendment, which purportedly subordinated Plaintiffs to the Lender Defendants and their managed funds—select Term Loan Lenders cherry-picked by Envision for favorable treatment in exchange for dropping legal challenges to a separate recapitalization Envision—and other Term Loan Lenders.

3.      In April 2022, Envision designated affiliates representing 83% ("**83% AMSURG Assets**") of its valuable ambulatory surgical center business ("**AMSURG**") as unrestricted subsidiaries under the Original Credit Agreement in order to effectuate a multi-billion dollar recapitalization ("**AMSURG Drop-Down**"), allowing Envision to raise $1.1 billion in new money first lien debt and a $200 million committed delayed draw facility, both with first lien priority to the 83% AMSURG Assets previously available to satisfy Envision's obligations on the Term Loans. Prior to completion of the AMSURG Drop-Down, Envision neither sought nor received Term Loan Lender consent.

4.      Then, concurrent with the AMSURG Drop-Down, Envision engaged in a series of "open-market purchases" privately negotiated with select Term Loan Lenders, and not offered to all such lenders, whereby Envision exchanged $1.826 billion in Term Loans for $1.3 billion in new loans with second lien priority to the 83% AMSURG Assets ("**AMSURG Exchange**" and, together with the AMSURG Drop-Down, "**AMSURG Transactions**"). As a result, the Term Loan

---

[2] This includes $5.45 billion aggregate principal amount Term Loans issued in connection with the credit agreement dated October 11, 2018 ("**Original Credit Agreement**") and approximately $394.8 million of incremental term loans under the Original Credit Agreement incurred by Envision on April 27, 2020.

Lenders—who would have been able to look to Envision's valuable AMSURG assets for repayment based on their existing first lien secured position at Envision—were subordinated to $2.4 billion to $2.6 billion of first and second lien secured debt in respect of the 83% AMSURG Assets.

5.      But the AMSURG Transactions violated several provisions of the Original Credit Agreement. Almost immediately, a majority of Term Loan Lenders excluded from the AMSURG Exchange, including certain Plaintiffs, organized with counsel—the law firms Gibson, Dunn & Crutcher LLP ("**Gibson**") and Kasowitz Benson Torres & Friedman LLP ("**Kasowitz**")—to file suit and challenge the AMSURG Transaction.

6.      On information and belief, Envision—understanding the AMSURG Transactions would be subject to legitimate challenge under the Original Credit Agreement—strategically courted a select group of the organizing Term Loan Lenders and offered these lenders (*i.e.*, the Lender Defendants and their managed funds) the right to "uptier" their Term Loans and receive priority over their fellow Term Loan Lenders (on favorable terms never offered to the non-participating Term Loan Lenders) in exchange for their retroactive consent to the AMSURG Transactions and abandonment of their planned litigation ("**Uptier Transaction**").

7.      Envision then tried to coerce releases from the remaining Term Loan Lenders, threatening them with "fourth-out" treatment if they did not grant releases and instead wished to preserve their claims and rights in respect of the AMSURG Transactions and the Uptier Transaction. Plaintiffs are among those lenders who did not grant releases and, as a result, were purportedly subordinated.

8.      The Uptier Transaction—which is the subject of this action—was accomplished through Defendants' July 22, 2022 purported amendment to the Original Credit Agreement. The

Amended Credit Agreement purports to change the distribution waterfall and convert previously *pari passu* lenders enjoying equal priority to the collateral securing their Term Loans into separate classes of creditors, with different priority rights.

9.      As demonstrated by the Debtors' proposed plan of reorganization, the purported Amended Credit Agreement, among other things, effectively (i) reduced Plaintiffs' loan balances by making their recovery on their Term Loans much less than what the Lender Defendants will recover on their previously *pari passu* Term Loans and (ii) stripped Plaintiffs of their collateral interests. Both implicate Plaintiffs' "sacred rights" under Section 13.1 of the Original Credit Agreement ("**Sacred Rights**"), requiring unanimous consent—or at least consent of every adversely-affected lender—to: (i) forgive or reduce the principal amount or interest rate on the loan, (ii) extend the maturity of the loan, (iii) release the guarantors under the guarantees, or (iv) release all or substantially all of the collateral under the security documents related to the Original Credit Agreement.

10.     Such Sacred Rights have been implicated in other uptier transaction litigations governed, as the Original Credit Agreement is, by New York law. For example, in *ICG Global Loan Fund 1 DAC v. Boardriders Inc.*, Index No. 655175/2020, 2022 WL 10085886, at *8 (Sup. Ct. N.Y. Cnty. Oct. 17, 2022), the New York Supreme Court ruled on a motion to dismiss that, where the uptier transaction at issue extinguished the plaintiffs' *pari passu* treatment, "plaintiffs have posited a reasonable interpretation" of the credit agreement that the effect of the uptiering was to "reducing the principal amount of [plaintiffs] debt to zero" in violation of a similar sacred right. Similarly, in *Audax Credit Opportunities Offshore Ltd. v. TMK Hawk Parent, Corp.*, 72 Misc. 3d 1218(A), at *9 (Sup. Ct. N.Y. Cnty. 2021), the New York Supreme Court held on a motion to dismiss that "[o]ne reasonable way to read section 9.02[b][i][D] [part of the applicable

credit agreement's sacred rights provision] is that it prohibits Defendants from placing any tranche of debt above Plaintiffs' place in the waterfall, even if the order of distribution in section 4.02 remains facially unaffected."

11.     Further, Defendants, through the Uptier Transaction, breached their duty of good faith and fair dealing under the Original Credit Agreement by cherry-picking existing Envision lenders to enjoy favorable treatment in the Uptier Transaction, quashing the remaining lenders' legal challenge by buying consent from the Lender Defendants while threatening others with subordination to obtain their releases, and ultimately consummating the Uptier Transaction. The Uptier Transaction deprived Plaintiffs of the benefit of their bargain, subordinating their loans and attempting to hinder Plaintiffs' ability to protect their bargained for rights by purportedly amending certain provisions of the Original Credit Agreement to restrict or otherwise entirely preclude the Fourth-Out Lenders' ability to bring legal action related to the Uptier Transaction.

12.     Again, this is not unlike other challenged transactions in which majority lenders attempted to abuse their power by limiting minority lenders' ability to sue via amendments to a credit agreement – where breach of good faith and fair dealing claims have survived motions to dismiss. For example, in *Boardriders*, 2020 WL 10085886, at *9, the New York Supreme Court noted that plaintiffs' allegations that defendants attempt to amend no-action provisions in the parties' credit agreement to "hinder plaintiffs' ability to sue" were "sufficient to show that the defendants worked in concert and in secret to deprive plaintiffs of the benefit of their bargain, *i.e.*, *pro rata* distribution of loan repayments, in bad faith." Meanwhile, in *LCM XXII Ltd. v. Serta Simmons Bedding, LLC*, No. 21 Civ 3987 (KPF), 2022 WL 953109, at *14 (S.D.N.Y. Mar. 29, 2022), the United States District Court for the Southern District of New York found that plaintiffs had adequately pleaded an implied covenant of good faith and fair dealing claim where their "first-

lien, priority, pro rata rights" were subverted by defendants' creation of a new tranche of debt with priority rights senior to those held by plaintiffs.

13.     As a result of (i) such blatant breaches of their contractual obligations under the Original Credit Agreement and other egregious, bad faith misconduct by Defendants as described herein, and (ii) the Debtors' proposed classification and treatment of the Fourth Out Lenders as unsecured creditors in their proposed plan, Plaintiffs have been significantly harmed. Accordingly, Plaintiffs are left with no choice but to file this action, which requests, among other things, that the Bankruptcy Court award damages, attorneys' fees and costs, and additional equitable relief as may be appropriate to the Plaintiffs.

## PARTIES

14.      Plaintiff Vibrant Capital Partners, Inc. is a Delaware corporation with its principal place of business at 350 Madison Avenue, 17th Floor, New York, NY 10017.

15.     Plaintiff Vibrant Credit Partners, LLC is a Delaware limited liability company with its principal place of business at 350 Madison Avenue, 17th Floor, New York, NY 10017.

16.     Plaintiff Saratoga Investment Corp. CLO 2013-1 Ltd. is a Delaware corporation with its principal place of business at 535 Madison Avenue, 4th Floor, New York, NY 10022.

17.     Plaintiff Crescent Capital Group, LP is a Delaware limited partnership with its principal place of business at 299 Park Avenue, 33rd Floor, New York, NY 10171.

18.     Defendant Envision Healthcare Corporation is a Delaware corporation based in Nashville, Tennessee 37215. Defendant may be served through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

19.     Upon information and belief, Defendant Arrowmark Colorado Holdings LLC is a Delaware limited liability company with its principal place of business at 100 Fillmore Street,

Suite 325, Denver, CO 80206. Defendant may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

20.     Upon information and belief, Defendant Barings LLC is a Delaware limited liability company with its principal place of business at 300 South Tryon Street, Suite 2500, Charlotte, NC 28202. Defendant may be served through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

21.     Upon information and belief, Defendant Benefit Street Partners, LLC is a Delaware limited liability company with its principal place of business at 9 West 57th Street, Suite 4920, New York, NY 10019. Defendant may be served through its registered agent, Donald J. Puglisi, Puglisi & Associates, 850 Library Avenue, Suite 204, Newark, DE 19711.

22.     Upon information and belief, Defendant Black Diamond Credit Strategies Master Fund, LTD is a Cayman LTD with its principal place of business at 2187 Atlantic St., 9th Floor, Stamford, CT 06902.

23.     Upon information and belief, Defendant BlackRock Financial Management, Inc. is a Delaware corporation with its principal place of business at 50 Hudson Yards, New York, NY 10001. Defendant may be served through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

24.     Upon information and belief, Defendant Blackstone Alternative Credit Advisors LP is a Delaware limited partnership with its principal place of business at 345 Park Avenue, 31st Floor, New York, NY 10154. Defendant may be served through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

25.     Upon information and belief, Defendant BofA Securities, Inc. is a Delaware corporation with its principal place of business at One Bryant Park, New York, NY 10036. Defendant may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

26.     Upon information and belief, Defendant AS Birch Grove, LP is a Delaware limited partnership with its principal place of business at 590 Madison Avenue, 38th Floor, New York, NY 10022. Defendant may be served through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

27.     Upon information and belief, Defendant Brigade Capital Management LP is a Delaware limited partnership with its principal place of business at 399 Park Avenue, 16th Floor, New York, NY 10022.  Defendant may be served through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

28.     Upon information and belief, Defendant BroadRiver Asset Management, L.P. is a Delaware limited partnership with its principal place of business at 350 5th Avenue, Suite 3100, New York, NY 10016.  Defendant may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

29.     Upon information and belief, Defendant Canyon Partners, LLC is a Delaware limited liability corporation with its principal place of business at 1370 6th Avenue, 30th Floor, New York, NY 10019. Defendant may be served through its registered agent, 850 New Burton Road, Suite 201, Dover, DE 19904.

30.     Upon information and belief, Defendant Carlyle CLO Management L.L.C. is a Delaware limited liability corporation with its principal place of business at 1 Vanderbilt Avenue,

New York, NY 10017.  Defendant may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

31.     Upon information and belief, Defendant CIFC Asset Management LLC is a Delaware limited liability company with its principal place of business at 875 Third Avenue, 24th Floor, New York, NY 10022. Defendant may be served through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

32.     Upon information and belief, Defendant Columbia Cent CLO Advisers, LLC is a Delaware limited liability company with its principal place of business at 290 Congress Street, Boston, MA 02210.  Defendant may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

33.     Upon information and belief, Defendant Eaton Vance Management is a Massachusetts Voluntary Association with its principal place of business at 2 International Place, 9th Floor, Boston, MA 02110. Defendant may be served through its registered agent, CT Corporation System, 155 Federal Street, Suite 700, Boston, MA 02110.

34.     Upon information and belief, Defendant First Eagle Alternative Credit, LLC is a Delaware limited liability company with its principal place of business at 1345 Avenue of the Americas, 48th Floor, New York, NY 10105.  Defendant may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

35.     Upon information and belief, Defendant First Trust Capital Solutions, L.P. is a Delaware limited partnership with its principal place of business at 120 E. Liberty Drive, Suite 400, Wheaton, IL 60187.  Defendant may be served through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

36.     Upon information and belief, Defendant First Trust Advisors, L.P. is Delaware limited partnerships with its principal place of business at 120 E. Liberty Drive, Suite 400, Wheaton, IL 60187.  Defendant may be served through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

37.     Upon information and belief, Defendant HPS Investment Partners, LLC is a Delaware limited liability company with its principal place of business at 40 West 57th Street, 33rd Floor, New York, NY 10019.  Defendant may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

38.     Upon information and belief, Defendant HSBC Americas Corporation (Delaware) is a Delaware corporation with its principal place of business at 66 Hudson Boulevard East, New York, NY 10001.  Defendant may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

39.     Upon information and belief, Defendant Intermediate Capital Group, Inc. is a Delaware corporation with its principal place of business at 277 Park Avenue, New York, NY 10172.  Defendant may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

40.     Upon information and belief, Defendant Invesco Senior Loan Fund is a Delaware limited liability company with its principal place of business at 1331 Spring Street NW, Suite 2500, Atlanta, GA 30309.  Defendant may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

41.     Upon information and belief, Defendant Irradiant Partners, LP is a Delaware limited partnership with its principal place of business at 2025 Guadalupe St., Suite 260, Austin,

TX 78705.   Defendant may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

42.      Upon information and belief, Defendant King Street Capital Management, L.P. is a Delaware limited partnership with its principal place of business at 299 Park Ave, 40th Floor, New York, NY 10171.  Defendant may be served through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

43.      Upon information and belief, Defendant Marathon Asset Management, L.P. is a Delaware limited partnership with its principal place of business at One Bryant Park, New York, NY 10036.  Defendant may be served through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

44.      Upon information and belief, Defendant Mariner Investment Group, LLC is a Delaware limited liability company with its principal place of business at 299 Park Avenue, 12th Floor, New York, NY 10171. Defendant may be served through its registered agent, Cogency Global, Inc., 850 New Burton Road, Suite 201, Dover, DE 19904.

45.      Upon information and belief, Defendant MidOcean Partners, L.P. is a Delaware limited partnership with its principal place of business at 245 Park Avenue, 38th Floor, New York, NY 10167.  Defendant may be served through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

46.      Upon information and belief, Defendant MJX Asset Management LLC is a Delaware limited liability company with its principal place of business at 12 E 49th Street, 38th Floor, New York, NY 10017.  Defendant may be served through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

47.     Upon information and belief, Defendant Napier Park Global Capital (US) LP is a Delaware limited partnership with its principal place of business located at 280 Park Avenue, 3rd Floor, New York, NY 10017.   Defendant may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

48.     Upon information and belief, Defendant Neuberger Berman Investment Advisers LLC is a Delaware limited liability company with its principal place of business at 190 S LaSalle Street, 24th Floor, Chicago, IL 60603.   Defendant may be served through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

49.     Upon information and belief, NYL Investors LLC is a Delaware limited liability company with its principal place of business at 51 Madison Avenue, New York, NY 10010. Defendant may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

50.     Upon information and belief, Defendant Oak Hill Advisors, L.P. is a Delaware limited partnership with its principal place of business at One Vanderbilt, 16th Floor, New York, NY 10017.   Defendant may be served through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

51.     Upon information and belief, Defendant Octagon Credit Investors, LLC is a Delaware limited liability company with its principal place of business at 250 Park Avenue, New York, NY 10177.   Defendant may be served through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

52.     Upon information and belief, Defendant Palmer Square Capital Management, LLC is a Delaware limited liability company with its principal place of business at 1900 Shawnee

Mission Parkway, Suite 315, Mission Woods, KS 66205.  Defendant may be served through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

53.     Upon information and belief, Defendant PGIM, Inc. is a New Jersey corporation with its principal place of business at 655 Broad Street, 8th Floor, Newark, NJ 07102. Defendant may be served through its registered agent, CT Corporation System, 820 Bear Tavern Road, West Trenton, NJ 08628.

54.     Upon information and belief, Defendant PPM Loan Management Company, LLC is an Illinois limited liability company with its principal place of business at 225 W. Wacker Dr., Chicago, IL 60606.  Defendant may be served through its registered agent, United Corporate Services, Inc., 901 S. 2nd Street, Suite 201, Springfield, IL 62704.

55.     Upon information and belief, Defendant Redding Ridge Asset Management LLC is a Delaware limited liability company with its principal place of business at 126 E. 56th St., 22nd Floor, New York, NY 10022.  Defendant may be served through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

56.     Upon information and belief, Defendant Redwood Capital Management, LLC is a Delaware limited liability company with its principal place of business at 250 W. 55th Street, New York, NY 10019.  Defendant may be served through its registered agent, VCorp Services, LLC, 108 W. 13th Street, Suite 100, Wilmington DE 19801.

57.     Upon information and belief, Defendant Sculptor Loan Management LP is a Delaware limited partnership with its principal place of business at 9 West 57th St., 39th Floor, New York, NY 10019.  Defendant may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

58.    Upon information and belief, Defendant Sound Point Capital Management, LP is a Delaware limited liability company with its principal place of business at 375 Park Avenue, New York, NY 10152.  Defendant may be served through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

59.    Upon information and belief, Defendant Strategic Value Partners, LLC is a Delaware limited liability company with its principal place of business at 100 West Putnam Avenue., Greenwich, CT 08630.  Defendant may be served through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

60.    Upon information and belief, Defendant Victory Capital Mgmt, Inc. is a Delaware corporation with its principal place of business at 280 Park Avenue, New York, NY 10017. Defendant may be served through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

61.    Upon information and belief, Defendant Voya Alternative Asset Management LLC is a Delaware limited liability company with its principal place of business at 7337 East Doubletree Ranch Road, Suite 100, Scottsdale, AZ 85258.  Defendant may be served through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

62.    Upon information and belief, Defendant Voya Investment Management Co. LLC is a Delaware limited liability company with its principal place of business at 7337 East Doubletree Ranch Road, Suite 100, Scottsdale, AZ 85258.  Defendant may be served through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

63.    Upon information and belief, Defendant Wellfleet Credit Partners LLC is a Connecticut limited liability company with its principal place of business at 8 Sound Shore Drive,

Suite 308, Greenwich, CT 06830.  Defendant may be served through its registered agent, 671 Burnside Avenue, East Hartford, CT 06108.

## JURISDICTION AND VENUE

64.     The Bankruptcy Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rules**") and Rule 7008-1 of the Bankruptcy Local Rules for the Southern District of Texas ("**Local Rules**"), Plaintiffs consent to the entry of final orders or judgment by this Court in connection with this adversary proceeding if it is determined that, absent consent of the parties, the Court cannot enter final orders or judgments consistent with Article III of the United States Constitution.

65.     Venue is proper in this district under 28 U.S.C. § 1409(a). This adversary proceeding is related to *In re Envision Healthcare Corporation, et al.*, Case No. 23-90342 (CML) under Chapter 11, pending in this district.

66.     This adversary proceeding is commenced pursuant to Bankruptcy Rule 7001(1) and (9).

## FACTUAL BACKGROUND

**I.     AMSURG IS A VITAL PART OF ENVISION'S BUSINESS.**

67.      Envision is a national medical group that provides physician services to hospitals and health systems and serves as an operator of ambulatory surgical centers in partnership with physicians and other healthcare providers across the United States.

68.     Envision operates across two segments: Envision Physician Services and AMSURG.

69.     Envision Physician Services provides management services to medical groups and physician practices to 139 health systems, and directly or indirectly employs approximately 17,000 healthcare professionals and delivers services to over 1,200 clinical departments.

70.     In turn, AMSURG owns and operates ambulatory surgery centers ("**ASCs**") in partnership with physicians and other healthcare providers. ASCs are medical facilities that specialize in outpatient surgical procedures, or those that do not require hospital admission or overnight stays.

71.      AMSURG currently operates as a network of approximately 4,400 physicians at more than 250 ASCs nationally and, directly and indirectly through its subsidiaries owns approximately 1,000 subsidiaries and 1,400 entities in which Envision owns substantial joint venture interests.

72.     As of March 31, 2022, AMSURG constituted 16% of Envision's total revenue and, on information and belief, was expected to grow while Envision Physician Services was expected to struggle financially.

II.    ENVISION, LENDER DEFENDANTS, PLAINTIFFS, AND OTHERS AGREE TO THE TERMS OF THE ORIGINAL CREDIT AGREEMENT, WHICH PROVIDES VITAL PROTECTIONS FOR ALL LENDERS' "SACRED RIGHTS."

73.    On October 11, 2018, Envision, as borrower, entered into the Original Credit Agreement with Plaintiffs, Lender Defendants and their managed funds, and others, for a senior secured revolving credit facility in an aggregate principal amount of $300 million ("**Revolving Credit Facility**") and a senior secured term loan facility in an aggregate principal amount of $5.45 billion ("**Term Loan Facility**"). On April 27, 2020, Envision incurred approximately $394.8 million of incremental term loans under the Term Loan Facility.

74.    Plaintiffs are lenders under the Term Loan Facility, collectively holding approximately $71.8 million of Term Loans.

75.    The Lender Defendants and/or their managed funds are also lenders under the Term Loan Facility.

76.    The Original Credit Agreement is a typical syndicated credit facility. In connection with financing needs that are too large or risky for any single lender to finance, the borrower arranges to borrow the amount needed from a "syndicate" of lenders, all under a single loan agreement. The loan agreement in a syndicated credit facility contains various provisions to ensure that the borrower treats the loans from each lender equally and as part of a "single" loan. Examples of such provisions include *pro rata* payment requirements mandating that the borrower make payments on the loans equally among all lenders and the requirement that amendments to the *pro rata* payment provisions require the consent of all lenders. Without these *pro rata* protections, the borrower could elect to pay certain favored lenders a greater portion (or even all) of their loans ahead of other lenders.

77.     Section 11.13 of the Original Credit Agreement provided that in the event of an acceleration of Envision's obligations under the Original Credit Agreement or an Event of Default, all lenders would have an equal right to repayment under the Original Credit Agreement, without providing any lender or group of lenders with priority over another:

> [A]ny amount received by the Administrative Agent or the Collateral Agent from any Credit Party (or from proceeds of any Collateral) following any acceleration of the Obligations under this Agreement or any Event of Default with respect to Holdings or the Borrower under Section 11.5 shall be applied:
>
> …
>
> (ii) second, to the Secured Parties, an amount equal to all Obligations… owing to them on the date of any distribution, and, if such moneys shall be insufficient to pay such amounts in full, then ratably (without priority of any one over any other) to such Secured Parties in proportion to the unpaid amounts thereof.

Original Credit Agreement Section 11.13.

78.     The only instance in which Envision may purchase or prepay the Term Loans on a non-*pro rata* basis is provided for in Section 13.6 of the Original Credit Agreement, which required any such non-*pro rata* purchase or prepayment to be made either via Dutch auction[3] procedures open to all applicable lenders on a *pro rata* basis, or through open market purchases.

79.     And, importantly, the lenders' so-called Sacred Rights can be found under Section 13.1(x)(i) of the Original Credit Agreement, which contain limitations on the Term Loan Lenders' ability to amend the Credit Agreement without the consent of *all* the lenders. Specifically, Section 13.1(x)(i) requires unanimous consent of adversely-affected lenders to: (i) forgive or reduce the principal amount or interest rate on the loan, (ii) extend the maturity of the loan, (iii) release the Guarantors under the Guarantees, or (iv) release all or substantially all the Collateral under the Security Documents.

---

[3]  A Dutch auction (also called a descending price auction) refers to a type of auction in which an auctioneer starts with a very high price, incrementally lowering the price until someone places a bid.

**III.**   **HAVING COMPLETED THE AMSURG TRANSACTIONS IN VIOLATION OF THE ORIGINAL CREDIT AGREEMENT, ENVISION ENGAGES IN THE UPTIER TRANSACTION, IN VIOLATION OF PLAINTIFFS RIGHTS, TO FRUSTRATE TERM LOAN LENDERS' EFFORTS TO LITIGATE.**

80.     Between April and August 2022, Defendants undertook a series of transactions, designed to allow Envision to incur additional debt and exchange existing Term Loan Facility debt at a discount at the expense of Plaintiffs and other Fourth Out Lenders.

**A.   *The AMSURG Transactions: Envision designates the 83% AMSURG Assets as unrestricted subsidiaries, which then incurred additional debt on behalf of Envision.***

81.     First, on April 29, 2022—without holding a vote of the Term Loan Lenders—Envision announced the AMSURG Drop-Down, in which certain third-party lenders, along with certain existing lenders to Envision under the Original Credit Agreement, (together, "**AMSURG Lenders**") would provide a $1.3 billion new money loan and delayed draw commitment to an unrestricted subsidiary of Envision ("**AMSURG Holdco**"), into which the 83% AMSURG Assets had been designated.

82.     Additionally, in the AMSURG Exchange, those AMSURG Lenders who were already lenders under the Term Loan Facility were offered the opportunity to exchange their $1.826 billion share of the Original Credit Agreement for $1.3 billion in second-lien debt supported by AMSURG Holdco.

83.     In total, the AMSURG Transactions placed $2.4 billion to $2.6 billion in debt in front of the $3.9 billion remaining in the Term Loan Facility with respect to equity from 83% of AMSURG's previously Restricted Subsidiaries.

84.     The AMSURG Transactions violated several provisions of the Original Credit Agreement.[4] First, by removing 83% of the AMSURG business from the Restricted Subsidiaries, Envision breached Section 9.16 of the Original Credit Agreement, which prohibited Envision and the Restricted Subsidiaries from "fundamentally and substantively alter[ing] the character of their business, taken as a whole, from the business conducted by the Borrower and Subsidiaries, taken as a whole, on the Closing Date." Second, because the AMSURG Drop-Down constituted a "Specified Disposition" under the Original Credit Agreement, Envision had prepayment obligations under Section 5.2 of the Original Credit Agreement, which it breached. Third, because of the AMSURG Transactions, Envision breached limitations under Section 10.1 of the Original Credit Agreement on the incurrence of additional indebtedness. Finally, the AMSURG Exchange was in violation of Section 13.6 of the Original Credit Agreement because such private exchanges were not "open market purchases" and, thus, must have been offered on a *pro rata* basis.

## B. *The "Uptier" Transaction: Envision, the Lender Defendants, and others execute the Amended Credit Agreement without the Fourth Out Lenders Consent, subordinating the Fourth Out Lenders.*

85.     In light of these breaches of the Original Credit Agreement, a majority of the Term Loan Lenders excluded from the AMSURG Exchange, including certain Plaintiffs and Lender Defendants, organized and retained counsel—Gibson and Kasowitz—to litigate the AMSURG Transactions.

86.     Upon information and belief, Envision was aware that the Term Loan Lenders had organized and that they had legitimate claims concerning the AMSURG Transactions. So, Envision engaged in a scheme of cherry-picking certain members of the organizing Term Loan

---

[4] Plaintiffs believe the Debtors' estates may have claims resulting from the AMSURG Transactions, including avoidance claims and claims implicating fiduciary duties. Plaintiffs understand that such claims are subject to investigation by the Official Committee of Unsecured Creditors.

Lenders (*i.e.*, the Lender Defendants), for preferred treatment in a subsequent uptiering of a subset of the Term Loan Lenders, offering them the opportunity to trade their existing term loans at a 17% discount for a higher priority position within the payment waterfall over the remaining, non-favored term lenders. In exchange, the preferred Lender Defendants gave their retroactive consent to the AMSURG Transactions, resulting in majority Term Loan Lender consent, waiver, and release of any claims in connection with those transactions.

87.    Then, Envision sought to coerce releases from the remaining Term Loan Lenders, threatening them with fourth-out (*i.e.*, last out) status unless they gave broad releases in exchange for uptiering on less favorable terms than the Lender Defendants, primarily into third-out priority with only 30% of their Term Loans offered second-out status at a 17% discount.

88.    To accomplish the Uptier Transaction, Envision purportedly amended the Original Credit Agreement on July 22, 2022 to (i) create a new-money first lien term loan facility of $300 million, (ii) divide the existing Term Loan Facility into four separate tranches of varying priority levels, and (iii) obtain the consent of participating Term Loan Lenders, including the Lenders Defendants, to ratify the already executed AMSURG Transactions described above.

89.    First, a group of existing Term Loan Lenders ("**Backstop Lenders**")—representing $2.139 billion, or 55.9% of the aggregate principal amount under the Term Loan Facility—agreed to backstop a $300 million new money first-out tranche ("**First Out Tranche**") and exchanged their existing Term Loans into a second-out tranche at a 17% discount ("**Second Out Tranche**"). Upon information and belief, the Lender Defendants and/or their managed funds were Backstop Lenders.

90.    Next, non-Backstop Lenders holding the remaining $1.69 billion of Term Loan principal were given the opportunity to participate *pro rata* in the new $300 million First Out

Tranche and simultaneously roll 30% of their existing Term Loans into the Second Out Tranche, at the same 17% discount, while uptiering the remaining 70% of their Term Loans into a third-out tranche ("**Third Out Tranche**"). A waterfall payment subordination applies to each Term Loan tranche—*i.e.*, the new Term Loan structure provides enhanced priority for participating lenders relative to Fourth Out Lenders.

91.     The purported Amended Credit Agreement effectuated the uptiering scheme.

92.     First, a new Section 2.1(c)(i) was added to the purported Amended Credit Agreement, under which the Backstop Lenders agreed to make new term loans not to exceed $300 million in the aggregate that would be fully repaid as the First Out Tranche. Next, Section 2.1(c)(ii) provides that the Backstop Lenders would have their existing Term Loan Facility holdings converted into the new Second Out Tranche at 83% of par value, while non-Backstop Lenders would have the ability to roll their existing Term Loan Facility holdings into this Second Out Tranche also at 83% of par value but capped at only 30% of their principal amount. Should the non-Backstop Lenders participation exceed 30% of the outstanding principal, Sections 2.1(d) and (f) provide that any excess principal would be rolled into a third out term loan tranche at par value. Finally, any Fourth Out Lenders would retain ownership of their existing loans, which would be relegated to the fourth-out term loan tranche ("**Fourth Out Tranche**"), which was subordinate to the First, Second, and Third Out Tranches. The Debtors' own First Day Declaration[5] illustrates how sharply this post-transaction structure differs from the pre-transaction structure:

---

[5]  23-90342, ECF No. 2.



93.     Consistent with this new structure, the Original Credit Agreement's waterfall provision at Section 11.13 was purportedly amended to provide priority to the First, Second, and Third Out Tranches above the non-consenting lenders' Fourth Out Tranche. This purported amendment to Section 11.13 can be seen in the below redline comparing the Original Credit Agreement's Section 11.13 to the purported Amended Credit Agreement:

11.13   Application of Proceeds. Subject to the terms of, the ABL Intercreditor Agreement, the First Lien Intercreditor Agreement and the Second Lien Intercreditor Agreement, in each case, if executed, any amount (including, but not limited to, proceeds of Collateral) received by the Administrative Agent or the Collateral Agent from any Credit Party (or from proceeds of any Collateral) following any acceleration of the Obligations under this Agreement or any Event of Default with respect to Holdings or the Borrower under Section 11.5 shall be applied:

(i)   *first,* to the payment of all reasonable and documented costs and expenses Incurred by the Administrative Agent or the Collateral Agent in connection with any collection or sale of the Collateral or otherwise in connection with any Credit Document, including all court costs and the reasonable fees and expenses of its agents and legal counsel, the repayment of all advances made by the Administrative Agent or the Collateral Agent hereunder or under any other Credit Document on behalf of any Credit Party and any other reasonable and documented costs or expenses Incurred in connection with the exercise of any right or remedy hereunder or under any other Credit Document to the extent reimbursable hereunder or thereunder;

(ii)   *second,* to the Secured Parties holding First Out Term Loans, an amount equal to all First Out Obligations (other than First Out Obligations with respect to clause (i) above) owing to them on the date of any distribution, and, if such moneys shall be insufficient to pay such amounts in full, then ratably (without priority of any one over any other) to such Secured Parties in proportion to the unpaid amounts thereof;

(iii)   *third,* to the Secured Parties holding Second Out Term Loans, an amount equal to all Second Out Obligations (other than Second Out Obligations with respect to clause (i) above) owing to them on the date of any distribution, and, if such moneys shall be insufficient to pay such amounts in full, then ratably (without priority of any one over any other) to such Secured Parties in proportion to the unpaid amounts thereof;

(iv)   *fourth,* to the Secured Parties holding Third Out Term Loans, an amount equal to all Third Out Obligations (other than Third Out Obligations with respect to clause (i) above) owing to them on the date of any distribution, and, if such moneys shall be insufficient to pay such amounts in full, then ratably (without priority of any one over any other) to such Secured Parties in proportion to the unpaid amounts thereof;

(ii)(v)   *fifth,* to the Secured Parties, an amount equal to all other Obligations (other than Obligations with respect to clause (i) through (iv) above) owing to them on the date of any distribution, and, if such moneys shall be insufficient to pay such amounts in full, then ratably (without priority of any one over any other) to such Secured Parties in proportion to the unpaid amounts thereof; and

(iii)(vi)*third*sixth, any surplus then remaining shall be paid to the applicable Credit Parties or their successors or assigns or to whomsoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct;

Notwithstanding the foregoing, amounts received from any Guarantor that is not an "Eligible Contract Participant" (as defined in the Commodity Exchange Act) shall not be applied to its Obligations that are Excluded Swap Obligations.

94.      As a result of Defendants' machinations, this purported amendment was agreed to by the majority lenders. Participating lenders were required to consent to and release any claims they may have arising out of the AMSURG Transactions and the Uptier Transaction. Plaintiffs and

the other Fourth Out Lenders, however, neither provided their consent to the purported Amended Credit Agreement nor released their claims arising out of those 2022 transactions.

95.     Following the execution of the purported Amended Credit Agreement, Envision used the proceeds of this incremental debt to repurchase $589 million of the Term Loan Facility under the Second, Third, and Fourth Out Tranches at a blended 58% discount. The repurchased Term Loans were subsequently cancelled.

96.     As of May 14, 2023, the day before the petition date of the Chapter 11 Cases, the balance under the First Out, Second Out, Third Out, and Fourth Out Tranches were $302 million, $1.96 billion, $648 million, and $172 million, respectively.

97.     According to the Fourth Out Lenders' treatment under the Debtors' proposed Plan—which is based on the purported Amended Credit Agreement—as a result of the Plaintiffs' purportedly deeply subordinated position in the purported Amended Credit Agreement's waterfall behind the First, Second, and Third Out lenders, the value of Plaintiffs' loans has been significantly reduced without Plaintiffs' consent and Plaintiffs' have effectively been stripped of their collateral, in violation of their Sacred Rights under Section 13.1 of the Credit Agreement. This is all but admitted under the terms of the Debtors' proposed chapter 11 plan,[6] whereby the Debtors classify the Fourth Out Lenders as unsecured, *i.e.* without any interest in the collateral they previously shared with the Lender Defendants.

98.     In addition to splitting the Term Loan Facility into four separate and unequal tranches, Section 12.7 of the purported Amended Credit Agreement purports to include new language restricting the lenders' ability to take action related to the execution of the purported Amended Credit Agreement unless the acting lenders post a cash indemnity with the

---

[6] 23-90342, ECF No. 479.  Any references to the Debtor's bankruptcy case or the filings therein, will be prefaced with a case number before the ECF No., to avoid confusion.

Administrative Agent of no less than the sum of the fees, costs, and expenses anticipated to be incurred in connection with such action and the amount of claim, obligation, or liability under such action. This places an unreasonably heavy burden on lenders, including Plaintiffs, to bring any action to enforce their rights under the Original Credit Agreement which have been violated.

99.     More egregiously, Envision, the Lender Defendants, and those other lenders who consented to the purported Amended Credit Agreement included new language in Section 12.12 of the purported Amended Credit Agreement which purports to restrict any Fourth Out Lender, including Plaintiffs, from taking any action to assert claims against any credit party concerning the purported Amended Credit Agreement.

100.    Accordingly, not only have Defendants violated Plaintiffs' Sacred Rights under the terms of the Original Credit Agreement, by executing the purported Amended Credit Agreement, which aims to disenfranchise the Fourth Out Lenders, Defendants have breached their implied covenant of good faith and fair dealing under the Original Credit Agreement.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Breach of Contract against all Defendants)

101.     Plaintiffs reassert and reallege the allegations contained in paragraphs 1 through 100 above as if fully set forth herein.

102.    Envision, the Lender Defendants, and Plaintiffs are parties to the Original Credit Agreement entered into on October 11, 2018.

103.    The Original Credit Agreement constitutes a valid and enforceable contract.

104.    Plaintiffs performed all conditions, covenants and promises required on their part to be performed in accordance with the terms and conditions of the Original Credit Agreement.

105.    Section 13.1 of the Original Credit Agreement requires the unanimous consent of the adversely affected lenders to (i) forgive or reduce the principal amount or interest rate on the loan, (ii) extend the maturity of the loan, (iii) release the Guarantors under the Guarantees, or (iv) release all or substantially all the Collateral under the Security Documents.

106.    Through the Uptier Transaction and the purported Amended Credit Agreement, Defendants breached the Original Credit Agreement and violated the Plaintiffs' Sacred Rights under Section 13.1 thereof by splitting the Term Loan Facility into four tranches, with Fourth Out Lenders, including Plaintiffs, being relegated to the Fourth Out Tranche and giving repayment priority to the First, Second, and Third Out Tranches over the Fourth Out Tranche. In doing so, Defendants effectively reduced Plaintiffs' loan amounts and stripped Plaintiffs of their collateral under the Original Credit Agreement without their consent.

107.    The Defendants, therefore, have breached the express terms of Sections 13.1 of the Original Credit Agreement.

108.    As a result of Defendants' breaches of Section 13.1 of the Original Credit Agreement, Plaintiffs are entitled to damages in an amount to be proven at trial. Plaintiffs have been damaged to the extent their Term Loans recover less in the Debtors' Chapter 11 Cases than the Term Loans held by the Lender Defendants, which would have been *pari passu* with Plaintiffs' Term Loans but for the Uptier Transaction.

### SECOND CAUSE OF ACTION
### (Declaratory Judgment against all Defendants invalidating the Amended Credit Agreement's waterfall provision)

109.    Plaintiffs reassert and reallege the allegations contained in paragraphs 1 through 108 above as if fully set forth herein.

110.     Section 11.13 of the purported Amended Credit Agreement purports to subordinate the Fourth Out Lenders' loans to those lenders within the newly formed First, Second, and Third Out Tranches of the Term Loan Facility, effectively reducing the Fourth Out Lenders' loan amounts and stripping the Fourth Out Lenders of their collateral under the Original Credit Agreement.

111.     Under Section 13.1 of the Original Credit Agreement, any effort to reduce a lenders' loan amount or to strip such lender of their collateral under the Original Credit Agreement requires the consent of the affected lenders.

112.     Plaintiffs did not consent to the execution of the purported Amended Credit Agreement, including Section 11.13's amended waterfall provision.

113.     Thus, the amendment to Section 11.13 of the Original Credit Agreement was made in violation of Plaintiffs' Sacred Rights under Section 13.1 of the Original Credit Agreement and should be considered null and void or otherwise unenforceable as against Plaintiffs.

114.     Accordingly, Plaintiffs seek a declaration that Section 11.13 of the purported Amended Credit Agreement is unenforceable, and that Plaintiffs and the remaining Fourth Out Lenders must be treated equally with the Second Out Tranche.

### THIRD CAUSE OF ACTION
**(Breach of the Implied Covenant of Good Faith and Fair Dealing
against all Defendants)**

115.     Plaintiffs reassert and reallege the allegations contained in paragraphs 1 through 114 above as if fully set forth herein.

116.     The Original Credit Agreement is a contract governed by New York law and, as such, includes an implied covenant of good faith and fair dealing.

117.    As described above, in effecting the Uptier Transaction, the Defendants engaged in egregious and bad faith conduct and essentially destroyed the value of Plaintiffs' loan to Envision; selectively promoting the interests of cherry-picked Lender Defendants at Plaintiffs' expense. Indeed, by entering into the purported Amended Credit Agreement, Defendants destroyed the Plaintiffs' rights to receive the fruits of their bargain in violation of the Defendants' implied covenant of good faith and fair dealing obligation.

118.    Specifically, the Lender Defendants abused their rights as lenders to orchestrate a transaction, in concert with Envision, that purports to allow them to exchange their term loans for priority debt ahead of Plaintiffs' loans.

119.    The Defendants further abused their rights under the Original Credit Agreement by engineering specific amendments aimed at systematically limiting the Fourth Out Lenders' ability to seek legal recourse, including by amending Section 12.7 to place onerous restrictions on Plaintiffs' ability to take legal action related to the Uptier Transaction. The Defendants further abused their rights by amending Section 12.12 of the Original Credit Agreement to provide that no Fourth Out Lender, including Plaintiffs, may commence litigation against any other credit party related to the purported Amended Credit Agreement.

120.    The Defendants' actions in pursuing and then consummating the Uptier Transaction, including the execution of the purported Amended Credit Agreement, were clearly not in good faith as evident by the fact that they took affirmative steps to attempt to prevent Plaintiffs and other Fourth Out Lenders from taking legal action to enforce their rights under the Original Credit Agreement.

121.    Plaintiffs are entitled to damages resulting from Defendants' egregious and bad faith conduct described herein in an amount to be proven at trial. Plaintiffs have been damaged to

the extent their Term Loans recover less in the Debtors' Chapter 11 Cases than the Term Loans held by the Lender Defendants, which would have been *pari passu* with Plaintiffs' Term Loans but for the Uptier Transaction.

## FOURTH CAUSE OF ACTION
### (Declaratory Judgment against all Defendants invalidating Sections 12.7 and 12.12 of the Amended Credit Agreement)

122.     Plaintiffs reassert and reallege the allegations contained in paragraphs 1 through 121 above as if fully set forth herein.

123.     As alleged herein, the Uptier Transaction was designed to violate Plaintiffs' rights under the Original Credit Agreement by providing the Lender Defendants with payment priority over Plaintiffs' loans that was not offered to Plaintiffs under the procedures set forth in the Original Credit Agreement.

124.     Aware that the Fourth Out Lenders may commence litigation to enforce their rights under the Original Credit Agreement, Defendants purported to amend the Original Credit Agreement to include provisions limiting the ability of Plaintiffs and other Fourth Out Lenders to enforce their rights under the Original Credit Agreement.

125.     Specifically, Defendants purportedly amended Section 12.7 of the Original Credit Agreement to place onerous restrictions on Plaintiffs' ability to take legal action related to the Uptier Transaction. Similarly, Defendants purportedly amended Section 12.12 of the Original Credit Agreement to provide that no Fourth Out Lender, including Plaintiffs, may commence litigation against any other credit party related to the Amended Credit Agreement.

126.     The purpose of the purported amendments was to infringe upon the rights of the Plaintiffs and disenfranchise them from enforcing their contractual rights violated by the Uptier Transaction.

127.    Thus, the purported amendments to Sections 12.7 and 12.12 of the Original Credit Agreement were done in bad faith and should be considered null and void or otherwise unenforceable.

128.    Accordingly, Plaintiffs seek a declaration that Sections 12.7 and 12.12 of the purported Amended Credit Agreement are unenforceable and in no way limit their ability to bring this action.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

i.      An award for damages against Defendants in an amount to be determined at trial;

ii.     A declaratory judgment in Plaintiffs' favor declaring that Sections 11.13, 12.7, and 12.12 of the purported Amended Credit Agreement are unenforceable;

iii.    An award for attorneys' fees to the fullest extent allowable by law;

iv.     Pre- and post-judgment interest at the maximum rate allowable by law; and

v.      Any such other and further relief as the Bankruptcy Court deems just and proper.

Dated: July 31, 2023

CHAMBERLAIN, HRDLICKA, WHITE,
WILLIAMS & AUGHTRY, P.C.

By: */s/ Michael K. Riordan*
    Jarrod B. Martin
    Texas Bar No. 24070221
    Michael K. Riordan
    Texas Bar No. 24070502
    1200 Smith Street, Suite 1400
    Houston, Texas 77002
    Tel: (713) 356-1280
    Fax: (713) 658-2553
    jarrod.martin@chamberlainlaw.com
    michael.riordan@chamberlainlaw.com

*Attorneys for Plaintiffs Vibrant Capital Partners, Inc., Vibrant Credit Partners, LLC, Saratoga Investment Corp. CLO 2013-1 Ltd., and Crescent Capital Group, LP*

-and-

**HERRICK, FEINSTEIN LLP**

*By: /s/ Christopher W. Carty*
  Sean E. O'Donnell (*pro hac vice to be filed*)
  Christopher W. Carty (*pro hac vice to be filed*)
  Steven B. Smith (*pro hac vice to be filed*)
  Two Park Avenue
  New York, New York 10016
  Tel: (212) 592-1400
  Fax: (212) 592-1500
  sodonnell@herrick.com
  ccarty@herrick.com
  ssmith@herrick.com

*Attorneys for Plaintiffs Vibrant Capital Partners, Inc., Vibrant Credit Partners, LLC, Saratoga Investment Corp. CLO 2013-1 Ltd., and Crescent Capital Group, LP, only to the extent adverse to Envision and the Lender Defendants, other than BofA Securities, Inc., Canyon Partners, LLC, and Intermediate Capital Group, Inc.*

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Vibrant Capital Partners, Inc., et al. | DEFENDANTS<br>Envision Healthcare Corporation, et al. |
|---|---|
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Jarrod B. Martin  and Michael K. Riordan<br>Chamberlain, Hrdlicka, White, Williams & Aughtry, P.C.<br>1200 Smith Street, Suite 1400 \| Houston, TX 77002<br>Phone: 713.658.1818 | **ATTORNEYS** (If Known) |
| **PARTY** (Check One Box Only)<br>□ Debtor          □ U.S. Trustee/Bankruptcy Admin<br>☒ Creditor        □ Other<br>□ Trustee | **PARTY** (Check One Box Only)<br>☒ Debtor          □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor        □ Other<br>□ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

1. Breach of Contract against all Defendants;
2. Declaratory Judgment against all Defendants invalidating the Amended Credit Agreement's waterfall provision;
3. Breach of the Implied Covenant of Good Faith and Fair Dealing against all Defendants;
4. Declaratory Judgment against all Defendants invalidating Sections 12.7 and 12.12 of the Amended Credit Agreement

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
- □ 11-Recovery of money/property - §542 turnover of property
- □ 12-Recovery of money/property - §547 preference
- □ 13-Recovery of money/property - §548 fraudulent transfer
- □ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- □ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- □ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- □ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- □ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- □ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- □ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- □ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
- □ 61-Dischargeability - §523(a)(5), domestic support
- □ 68-Dischargeability - §523(a)(6), willful and malicious injury
- □ 63-Dischargeability - §523(a)(8), student loan
- □ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- □ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- □ 71-Injunctive relief – imposition of stay
- □ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
- □ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- ☒ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- □ 01-Determination of removed claim or cause

**Other**
- □ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
- ☒ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☒ Check if this case involves a substantive issue of state law | □ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| □ Check if a jury trial is demanded in complaint | Demand  $ |

Other Relief Sought

Damages, attorney's fees, and pre- and post-judgment interest

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Envision Healthcare Corporation | BANKRUPTCY CASE NO.<br>23-90342 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Southern District of Texas | DIVISION OFFICE<br>Houston | NAME OF JUDGE<br>Christopher M. Lopez |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>/s/ Jarrod B. Martin | | |
| DATE<br><br>7/28/2023 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>Jarrod B. Martin | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.